UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

UNITED STATES OF AMERICA

                                              **REPORT & RECOMMENDATION**
                                              **12 CR 160 (NGG)(LB)**

    -against-

SHERMAN BARRO,

             Defendant.

-----------------------------------------------------------X
**BLOOM, United States Magistrate Judge:**

      Defendant Sherman Barro was indicted on two charges, importation of cocaine and possession of cocaine with intent to distribute, on February 29, 2012. (ECF No. 6.) Mr. Barro now moves to suppress his post-Miranda statements arguing that they were obtained in violation of his Miranda rights. (ECF No. 19.) The government opposes this motion (ECF No. 23) and defendant replied (ECF No. 24). The Honorable Nicholas G. Garaufis referred defendant's motion to me for a Report and Recommendation in accordance with 28 U.S.C. § 636(b). (ECF No. 26.) For the following reasons, it is respectfully recommended that defendant's motion to suppress should be granted.

## BACKGROUND

      The Court held an evidentiary hearing on February 13, 2013 and the parties filed post-hearing briefs. (ECF Nos. 35, 37-38.) At the hearing, the government presented the testimony of Special Agent Thomas Wilbert of the Joint Narcotics Smuggling Unit (JNSU), part of the Department of Homeland Security. The following summarizes the relevant facts based on Agent Wilbert's testimony and Mr. Barro's sworn affidavit.

On January 31, 2012, Mr. Barro flew on a Caribbean Airlines flight into John F. Kennedy International Airport from Jamaica with his wife and infant son. (Compl. ¶ 1; ECF No. 19, Def.'s Aff., ¶ 2.) After retrieving his bags, Customs and Border Protection (CBP) officers stopped Mr. Barro and his family. (Id. at ¶ 3.) A CBP officer searched Mr. Barro's bags and asked him questions about his trip to Jamaica.[1] (Id. at ¶ 4.) CBP officers then poked Mr. Barro's bags and discovered cocaine. (Id. at ¶¶ 4-5.) The CBP officers detained Mr. Barro and his bags in the CBP pat-down room and detained Mrs. Barro and her infant son in a room next door. (Id. at ¶ 5; ECF No. 42, Tr. 7, 9.) Agent Wilbert testified that both Mr. and Mrs. Barro were going to be placed under arrest, but when CBP officers detained them in separate rooms, neither were Mirandized. (Tr. 10, 38.)

At 12:01 p.m. on January 31, 2012, CBP notified JNSU that they had seized cocaine from a passenger. (Tr. 9, 28-29.) Agent Wilbert and his co-agent Eric Pauta[2] arrived at the CBP pat-down room at 12:20 p.m. (Tr. 9, 27.) Upon arrival, Agent Wilbert entered the pat-down room for about five minutes. (Tr. 29, 37-38.) He looked at Mr. Barro and his bags and then left the room; he did not speak with Mr. Barro or introduce himself at that time. (Tr. 29.) Agent Wilbert then conferred with the CBP officers about the two suspects; among other things, Agent Wilbert learned that Mr. Barro was unemployed and that Mrs. Barro worked as a nurse. (Tr. 10, 30.) Based on the information provided, Agent Wilbert decided to question Mrs. Barro first. (Tr. 10.)

Agent Wilbert could not recall what time he entered Mrs. Barro's room, but testified that he "was probably in the room five or – maybe five or ten minutes" prior to reading Mrs. Barro her rights. (Tr. 38-39.) Agent Wilbert testified that he does not immediately read a defendant

---

[1] Mr. Barro does not move to suppress his responses to these questions.
[2] Agent Wilbert stated that he completed "upwards of 95 percent of the questioning," but that Agent Pauta was also present for the interviews with Mr. and Mrs. Barro. (Tr. 24-25.) Agent Pauta was not called to testify at the evidentiary hearing.

2

his/her rights. (Tr. 18.) Instead, he stated that "I generally for every case I give a spiel[3] before reading them their rights." (Id.) Wilbert testified that his spiel was as follows:

> I told him that he was under arrest for the importation of cocaine. I identified myself as a federal agent. I tell him that it's a serious offense, what's happening here. I tell him that it's important that he is honest with me and that he tells me the truth. I tell him that, you know, his cooperation is something that could help him out in the long run. I tell him that by telling me the truth, I will let the AUSA know and it could help him possibly with a lower sentence. I also tell him that I can't guarantee him anything. I can't promise him anything. I can't determine his sentence, the AUSA can't determine his sentence, that is solely up to the judge, but from what I have seen in the past, people that have told the truth have received lesser sentences. I also tell him that it's up to him if he wants to talk. If he doesn't that's fine also.[4]

(Tr. 18-19.) Most importantly, Agent Wilbert was asked "After giving that preliminary spiel did you then read defendant his rights?" and he candidly answered "Well, then I asked him if he wants to talk to us, and if he acknowledges 'yes,' then I read him his rights." (Tr. 19.)

Agent Wilbert gave Mrs. Barro the spiel when he entered her room. After Mrs. Barro agreed to talk with Agent Wilbert, Agent Wilbert read Mrs. Barro her Miranda warnings at 12:43 p.m. (Tr. 37.) Mrs. Barro then waived her rights and Agent Wilbert continued questioning her. Agent Wilbert stated that during this first round of questioning[5] he spoke with Mrs. Barro for thirty to forty minutes, but "maybe closer to a half-hour." (Tr. 17, 38.) After speaking with Mrs. Barro, Agent Wilbert consulted with his co-agent and the CBP officers and then went in to speak with Mr. Barro. (Tr. 17.) Agent Wilbert began his interview with Mr. Barro with the spiel, but testified that the spiel lasted "maybe a little bit longer for him." (Tr. 39.) After delivering the

---

[3] The Merriam-Webster online dictionary defines spiel as "a voluble line of often extravagant talk: pitch." http://www.merriam-webster.com/dictionary/spiel (last visited Mar. 18, 2013). Cambridge Dictionaries Online defines spiel as "a speech, esp. one that is long and spoken quickly and is intended to persuade the listener about something." http://dictionary.cambridge.org/us/dictionary/american-english/spiel?q=spiel (last visited Mar. 18, 2013). Dictionary.com similarly defines spiel as a "glib speech intended to persuade." http://m.dictionary.com/?q=spiel&submit-result-SEARCHD=Search (last visited Mar. 18, 2013).
[4] On cross-examination Agent Wilbert added that the spiel to Mr. Barro included statements to the effect that a lot of cocaine had been seized and that Barro was facing a lot of jail time. (Tr. 33-34.)
[5] Agent Wilbert questioned Mrs. Barro for a second time after he interviewed Mr. Barro. (Tr. 17, 38.)

3

spiel, Agent Wilbert asked Mr. Barro if he would like to talk and Mr. Barro agreed to speak with him. (Tr. 19.)

At about 1:30 p.m., after Mr. Barro answered "yes" he would speak to the two agents, Agent Wilbert read Mr. Barro his Miranda warnings. (Tr. 35.) Agent Wilbert then questioned Mr. Barro in detail about his trip to Jamaica and about the cocaine in his bags. (Tr. 19; Def.'s Aff. ¶ 8.) Agent Wilbert interviewed Mr. Barro for "maybe an hour-and-a-half." (Tr. 23.) Mr. Barro moves to suppress his post-Miranda statements.

**DISCUSSION**

Mr. Barro argues that Agent Wilbert's prewarning spiel rendered the subsequent Miranda warnings ineffective. Mr. Barro contends that his subsequent waiver of his Miranda rights was not made voluntarily, knowingly, and intelligently and that his post-Miranda statements should therefore be suppressed.[6]

In <u>Miranda v. Arizona</u>, the Supreme Court held that no statement obtained from custodial interrogation may be used against the defendant unless the government "demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). <u>Miranda</u> requires that the accused "be adequately and effectively apprised of his rights" prior to custodial interrogation. <u>Id.</u> at 467. Defendants today are informed of their rights through the now familiar Miranda warnings.[7] (<u>See, e.g.</u>, Ex. A.) A defendant may waive these rights, but the waiver must be made "voluntarily, knowingly, and intelligently." <u>Id.</u> at 444. "The government is required to prove waiver by a preponderance of the evidence." <u>United States v.</u>

---

[6] During oral argument before Judge Garaufis on January 10, 2013, defendant's counsel stated that while this is the crux of the issue, he does not dispute that the waiver "was knowing in the sense that [Mr. Barro] understood the rights, he understood the warnings, that he speaks English, etcetera . . . . We are arguing here that it's the intelligence and the voluntariness of this waiver that are both in question here." (ECF No. 41, 16.)

[7] Courts interchangeably refer to the warnings and rights enumerated in Exhibit A (ECF No. 23-1) as the Miranda warning, Miranda warnings, and Miranda rights.

4

Male Juvenile, 121 F.3d 34, 39 (2d Cir. 1997) (quoting United States v. Villegas, 928 F.2d 512, 518 (2d Cir. 1991)). Thus, the government must demonstrate that the waiver "was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986); see also United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995) ("[T]he government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and the consequences of waiving that right.")

### A. Custodial Interrogation

In this case, the parties agree that Mr. Barro was in custody for the purposes of Miranda when he was placed in the CBP pat-down room.[8] The suppression issue thus turns on whether Agent Wilbert's spiel, which he testified he generally gives before reading a defendant his rights, constitutes interrogation.

"[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Jones v. Murphy, 694 F.3d 225, 245 (2d Cir. 2012) (quoting Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980)). Mr. Barro argues that Agent Wilbert's exhortations to tell the truth and his unsolicited statement that he would inform the AUSA of Barro's cooperation constituted interrogation. The Court agrees. An agent's unsolicited statements "that any cooperation would be brought to the attention of the AUSA," and that "this was the time" to make a statement, constitute "impermissible interrogation." United States v. Plugh, 576 F.3d

---

[8] The government acknowledged that "the defendant and his wife are under arrest for the purposes of being in custody I believe as soon as Customs takes them into the pat-down room." (Tr. 48.) The government also concedes that "Customs officers do no Mirandize." (Tr. 48.)

5

135, 144 (2d Cir. 2009), *rev'd on other grounds*, 648 F.3d 118 (2d Cir. 2011); see also United States v. Montana, 958 F.2d 516, 518 (2d Cir. 1992) (an "unsolicited statement informing the defendants that any cooperation would be brought to the attention of the Assistant United States Attorney constitute[s] 'interrogation.'"). Accordingly, the Court finds that Agent Wilbert's unsolicited statements in his spiel constitute interrogation.[9]

### B. Midstream Miranda Warnings

Defendant argues that Agent Wilbert's pre-Miranda interrogation rendered his subsequent waiver involuntary and unintelligent. The Supreme Court addressed the validity of Miranda warnings administered midstream in an interrogation in Elstad v. Oregon, 470 U.S. 298 (1985), and Missouri v. Seibert, 542 U.S. 600 (2004). Elstad makes clear that a mere failure to provide Miranda warnings prior to custodial interrogation does not render a postwarning statement inadmissible. United States v. Capers, 627 F.3d 470, 474-75 (2d Cir. 2010) (explaining and applying Elstad); United States v. Carter, 489 F.3d 528, 534 (2d Cir. 2007) (interpreting Elstad). A statement made after a midstream warning must only be suppressed where "it was involuntarily made despite the *Miranda* warning." Carter, 489 F.3d at 534. However, Seibert shifted the focus away from the voluntariness of the confession to "whether the midstream *Miranda* warning was effective." Id. at 534-35. While Seibert did not overrule Elstad, it carved out an exception where a "two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." Seibert, 542 U.S. at 622 (Kennedy J., concurring); see also Carter, 489 F.3d at 536 ("*Seibert* lays out an exception to *Elstad* for cases in which a deliberate, two-step strategy was used by law enforcement to obtain the postwarning confession."). Seibert requires suppression of postwarning statements obtained from a deliberate

---

[9] In United States v. Rommy, 506 F.3d 108, 134 (2d Cir. 2007), the Second Circuit clarified that such statements do not constitute interrogation if made in response to a defendant's inquiries. Here, no evidence was presented that Mr. Barro solicited this information.

6

two-step procedure "absent specific, curative measures." 542 U.S. at 621 (Kennedy J., concurring).

Where a two-step procedure is employed, "[t]he burden rests on the prosecution to disprove deliberateness" "by a preponderance of the evidence." Capers, 627 F.3d at 479, 480. The plurality in Seibert laid out several objective factors to determine if the interrogating officers deliberately engaged in a two-step procedure; they include:

> the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second as continuous with the first.

Seibert, 542 U.S. at 615-16 (plurality opinion). The Second Circuit has established that these "are by no means the only factors to be considered when seeking to divine whether the officers' actions are sufficiently indicative of a deliberate circumvention of *Miranda*." Capers, 627 F.3d at 478. To determine deliberateness, "a court should review the totality of the objective and subjective evidence surrounding the interrogations." Id. at 479.[10]

The Second Circuit explained in Capers that this analysis requires "a searching and penetrating inquiry of the officer's testimony and proffered reasons for delaying [the] *Miranda*

---

[10] In Seibert, Justice Kennedy concludes that "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." 542 U.S. at 622 (Kennedy, J., concurring). However, the Second Circuit reads Seibert more broadly to allow for suppression even where there is minimal overlap between the prewarning and postwarning statements. See Carter, 489 F.3d at 536 (considering suppression where defendant made only one incriminatory statement before the administration of the Miranda warnings); McMillon v. Culley, No. 07-CV-4806 (CPS), 2009 U.S. Dist. LEXIS 68687, at *26 (E.D.N.Y. Aug. 5, 2009) (evaluating defendant's motion to suppress postwarning statements even though no prewarning incriminatory statement was made), *aff'd*, 380 F. App'x 63 (2d Cir. 2010). Although the degree of overlap was an important factor in deciding against suppression of the post-Miranda statements in both of these cases, the Court's subsequent decision in Capers made clear that overlap is but one of many factors to consider. While this factor was given significant weight in Carter and McMillon, other facts also contributed to the court's decisions. In Carter, the post-Miranda statements were elicited an hour after the unwarned remark, in a different location, and by a different officer who had no knowledge of the defendant's prior statements. 489 F.3d at 536. Moreover, the Court in Carter found that the prewarning question by the officer "was not coercive" and "not to interrogate." Id. at 537. In McMillon, the Court did not consider suppression in the first instance, but rather under the "deferential standard of AEDPA." 2009 U.S. Dist. LEXIS 68687, at *26. It found only that the state court's denial of the motion to suppress was not "a clearly unreasonable application of established Supreme Court precedent." Id.

7

warning." Id. at 482. An officer need not admit to deliberately employing such a two-step strategy for a court to grant suppression. Id. The Circuit has emphasized that once law enforcement initiates custodial interrogation "there is rarely, if ever, a legitimate reason to delay giving a *Miranda* warning . . . . Instead, the most plausible reason . . . is an *illegitimate* one, which is the interrogator's desire to weaken the warning's effectiveness." Id. at 480-81 (quoting United States v. Williams, 435 F.3d 1148, 1159 (9th Cir. 2006)). In fact, "the only legitimate reason to delay intentionally a *Miranda* warning until after custodial interrogation has begun is to protect the safety of the arresting officers or the public – neither of which was an issue here." Id. at 481 (citing United States v. Newtown, 369 F.3d 659, 677 (2d Cir. 2004)).

Nevertheless, the Capers court notes that an officer's inexperience, while not a legitimate excuse for failing to timely administer the Miranda warnings, may demonstrate a lack of deliberateness and thus permit the admission of a defendant's postwarning statement. Id. at 481. However, Agent Wilbert's delay in administering the Miranda warnings here cannot be attributed to inexperience. Agent Wilbert has worked for JNSU for more than five years and has participated in more than seventy-five narcotics seizures. (Tr. 4, 6.) Prior to that, Agent Wilbert served as police officer in Virginia and attended the police academy there. (Tr. 5.) He testified that he received six months of training on criminal procedure, law, interrogation, and Miranda at the Federal Law Enforcement Training Center before becoming a federal agent. (Tr. 5.) Moreover, he testified that he was "taught that any time there's an arrest [of] somebody, whether they physical arrest [sic] or they feel that they're in custody, the person has to be Mirandized" and that the Miranda warnings have "to be given without threat, force, or any type of coercion." (Tr. 5.) Thus, the Court finds that Agent Wilbert "had sufficient experience to know that a *Miranda* warning was unquestionably necessary in connection with [Barro's] post-arrest

8

interrogation." Capers, 627 F.3d at 481. Thus, "the corollary to that finding must also obtain. [Agent Wilbert] was experienced enough to know that in this case there was no valid reason to delay a *Miranda* warning." Id.

Agent Wilbert's candid testimony demonstrates that what he referred to as the spiel is a conscious and deliberate law enforcement strategy that he employs. Agent Wilbert stated that "generally for every case" he delays reading a suspect the Miranda warning until he gives his spiel. (Tr. 18.) He then asks the suspect "if he wants to talk to us and *if* he acknowledges 'yes,' *then* I read him his rights" (Tr. 19, emphasis added.) The spiel apparently stops once the suspect agrees to waive his right against self-incrimination and speak. Then, after a defendant has agreed to waive his rights, defendant is told for the first time what his rights are. This is the antithesis of the Miranda warnings. The plain meaning of a warning, to caution beforehand about certain acts, is entirely undermined when the Miranda warnings are given as an afterthought to a defendant who has already agreed to speak.

The ambiguous length and content of Agent Wilbert's spiel is also problematic. Agent Wilbert's in-court summary of the spiel took no more than a minute or two, but the spiel he gave to Mr. and Mrs. Barro was significantly longer. Agent Wilbert estimated that he spent "five to ten minutes" presenting the spiel to Mrs. Barro. (Tr. 39.) However, it is possible that the spiel took much longer as Agent Wilbert was unable to account for the eighteen minutes he spent with Mrs. Barro prior to reading her the Miranda warnings at 12:43 p.m. (Tr. 39.) Agent Wilbert also admits that the length of the spiel can vary, stating that it may have taken "a little bit longer" for Mr. Barro. (Tr. 39.) As the spiel was not recorded, the Court is unable to determine the exact wording, length, or content of the spiel, but based on Agent Wilbert's testimony, the Court infers that the spiel to Mr. Barro may have repeated exhortations to speak, to "help himself," and other

9

similar statements.[11] Agent Wilbert testified "when I interview people, I change . . . how I talk to them to see if there's a different reaction from them. So if I feel somebody's not being honest, I may put a little more pressure on them and raise my voice and use stronger words." (Tr. 23.) Here, the spiel may have been given in a sharper tone to "put a little more pressure" on Mr. Barro when he failed to respond to the first exhortation to tell the truth. How long would the spiel have continued before Mr. Barro was advised of his rights had he said "no" he did not want to speak to the agents? It is simply not credible that the spiel is just the agent's way of introducing himself to the defendant; the only plausible reason for the spiel is to deliberately delay the Miranda warnings, which weakens their effectiveness. The Court finds that the spiel is an intentional law enforcement strategy which vitiates the Miranda warnings' purpose.

Objective evidence also demonstrates that Mr. Barro was subject to a deliberate two-step interrogation. The Court first considers the objective factors outlined in Seibert. Unlike in Seibert and Capers, the pre-Miranda interrogation here was not exhaustive and did not elicit an incriminatory statement from defendant. This was found to militate against suppression in Carter. 489 F.3d at 536. However, unlike in Carter, the first interrogation and the Miranda warnings here were close in time and in the same location. Agent Wilbert gave Mr. Barro the spiel in the pat-down room until Mr. Barro agreed to speak with him. (Tr. 17-19.) Immediately thereafter, while still in the pat-down room, Agent Wilbert read Mr. Barro the Miranda warnings and obtained a waiver. (Tr. 19.) Neither the location nor the personnel changed. Agent Wilbert

---

[11] The government's citation to cases that found these statements permissible are mostly inapposite as they refer to situations in which these statements were made *after* a defendant had been read his Miranda rights. See e.g. United States v. Ruggles, 70 F.3d 262, 264 (2d Cir. 1995) (agents informed defendant of the benefits of cooperating after obtaining a waiver of his Miranda rights); United States v. Alvarado, 882 F.2d 645, 649 (2d Cir. 1989) ("it is uncontested that [defendant] had her *Miranda* rights explained to her, and signed a waiver of those rights, prior to" being told of the benefits of cooperation). The only exception cited is United States v. Gaines, 295 F.3d 293 (2d Cir. 2002). In that case defendant had a brief conversation about cooperation with the arresting FBI officer without being read his Miranda rights. Id. at 297. Later, he met with a different FBI officer, was read his Miranda rights, and gave a statement. Id. However, the change in location, the passage of time, and the change in FBI personnel distinguish Gaines from the case at bar.

interrogated Mr. Barro prior to providing him the Miranda warnings and continued questioning him afterwards. (Tr. 19.) Thus, in all material respects the second round of interrogation continued the first. See Capers, 627 F.3d at 484 (finding the temporal proximity and continuity of custody to "reasonably lead[] to the conclusion that the latter [interrogation] was a continuation of the former"). These factors favor suppression of Mr. Barro's postwarning statements.

The Court also looks to the length of time Mr. Barro was in custody before he received the Miranda warnings. It is uncontested that Mr. Barro was in custody when he was placed in the CBP pat-down room in or around 12:01 p.m. (Tr. 47-48.) Agent Wilbert entered the pat-down room where Mr. Barro was being detained at 12:20 p.m., but did not advise Mr. Barro of his Miranda rights at that time. (Tr. 29.) He left the room to interrogate Mrs. Barro first. (Tr. 29-30.) At some point about a half an hour later, Agent Wilbert re-entered the pat-down room, but again did not give Mr. Barro his Miranda warnings. (Tr. 18.) Instead, he gave Mr. Barro the spiel. (Tr. 18.) He continued with the spiel until Mr. Barro agreed to speak with him. (Tr. 19.) Finally, at approximately 1:30 p.m., about ninety minutes after he was taken into custody, Agent Wilbert read Mr. Barro his Miranda rights. (Tr. 35.) The amount of time that Mr. Barro was held in custody and given the spiel before he was given the Miranda warnings heightened the coercive nature of the custodial interrogation and further supports suppression of his postwarning statements.

The Court also finds that the spiel confuses the rights enumerated in the Miranda warnings and "adds information and suggestion to the *Miranda* warnings which prevent them from effectively conveying the suspects their rights." People v. Dunbar, 958 N.Y.S.2d 764, 772 (N.Y. App. Div. 2013). Although not controlling, the Court finds the January 30, 2013 decision

by the Appellate Division, Second Department persuasive on this issue. In Dunbar, the court evaluated the Queens County District Attorney's policy of reading a suspect a script, which the court dubbed "the preamble,"[12] prior to administering the Miranda warnings. Id. at 769. The Appellate Division considered "whether this procedure is effective to secure those individuals' fundamental constitutional privilege against self-incrimination and right to counsel" and found that it does not. Id. at 767. It held that "[w]hen the clear and unequivocal warnings devised in *Miranda* are combined with the information and suggestion contained in the preamble, the message conveyed to suspects is muddled and ambiguous . . . . it cannot be said with assurance that the suspects clearly understood their rights." Id. at 772. As a result, the court in Dunbar overturned defendant's conviction. Id. at 780.

Agent Wilbert's spiel is analogous to the preamble in Dunbar. When the spiel is combined with the Miranda warnings, it conveys a muddled and ambiguous message. The force and effect of the spiel is even more treacherous here because Agent Wilbert secured an oral waiver prior to advising Mr. Barro of his Miranda rights. The record does not establish that Mr. Barro clearly understood his rights and that the subsequent waiver was made with the "full awareness of the right being waived and the consequences of waiving that right." Jaswal, 47 F.3d at 542.

---

[12] The preamble in Dunbar reads as follows:
> If you have an alibi, give me as much information as you can, including the names of any people you were with.
>
> If your version of what happened is different from what we've been told, this is your opportunity to tell us your story. If there is something you need us to investigate about this case you have to tell us now so we can look into it.
>
> Even if you have already spoken to someone else you do not have to talk to us.
>
> This will be your only opportunity to speak with us before you go to court on these charges.

958 N.Y.S.2d at 768-69.

The government seeks to distinguish the case at bar by arguing that Agent Wilbert's spiel does not create the same "sense of immediacy and finality" as the preamble in Dunbar. (ECF No. 37, Gov.'s Post-Hearing Opp., 7.) Unlike the preamble which stated "you have to tell us now" and "this will be your only opportunity to speak with us before you go to court," the government contends that Agent Wilbert's spiel conveys "a laissez-faire view as to whether or not the defendant made a statement." (Id.) The Court is unconvinced. The court in Dunbar was able to review the precise preamble given to the defendant. Here, the Court has only a paraphrased summary of Agent Wilbert's spiel. Moreover, much of Agent Wilbert's time with the defendant is unaccounted for; he testified that his spiel to Mrs. Barro lasted "maybe five to ten minutes," but that the spiel lasted "[m]aybe a little bit longer for [Mr. Barro]." (Tr. 39.) Based on his testimony, Agent Wilbert entered the pat-down room to interrogate Mr. Barro sometime between 1:00 and 1:15 p.m.; yet the Miranda warnings were not given until 1:30 p.m. (Tr. 35-39.) Thus, Agent Wilbert's fifteen to thirty minute spiel to Mr. Barro must have added language not contained in his recitation of the spiel to the Court. Therefore, the government fails to demonstrate that there was no sense of immediacy and finality conveyed to Barro.

The government bears the burden on this motion. The government fails to establish by a preponderance of the evidence that despite Agent Wilbert's spiel, the subsequent Miranda warnings given to Mr. Barro were effective. Under the totality of the circumstances, the record establishes that the government employed a deliberate two-step interrogation procedure in Mr. Barro's case. The Court finds that the spiel given in this case vitiated the Miranda warnings and rendered Mr. Barro's waiver ineffective.

### C. Curative Measures

The government, citing to Elstad, argues that any violation of Miranda was cured when Agent Wilbert Mirandized Mr. Barro. However, where law enforcement employs a deliberate two-step strategy, postwarning statements must be excluded "unless curative measures are taken before the postwarning statement is made." Seibert, 542 U.S. at 622 (Kennedy, J., concurring); see also Capers, 627 U.S. at 484 (stating the same). Curative measures may include a temporal break between the prewarning interrogation and the Miranda warnings and "an additional warning that explains the likely inadmissibility of the prewarning custodial statement. Capers, 627 U.S. at 484 (quoting Seibert, 543 U.S. at 622 (Kennedy, J., concurring)). In this case, no curative measure was taken. There was no temporal break between the spiel and the reading of the Miranda warning and the second curative measure does not apply here as Mr. Barro made no incriminatory statement before receiving his Miranda warnings.

### CONCLUSION

The government fails to prove by a preponderance of the evidence that Mr. Barro waived his rights voluntarily, knowingly, and intelligently. Therefore, Mr. Barro's waiver of his Miranda rights should be held invalid and his postwarning statements should be suppressed.

"The requirement of warnings and waiver of rights is *fundamental* with respect to the Fifth Amendment privilege and not simply a preliminary ritual." Miranda, 384 U.S. at 476 (emphasis added). When the government gives a spiel, preamble, or whatever it may call it, before giving a defendant the required warnings, the government deliberately infringes on a defendant's fundamental rights. The government should not prosper from encroaching on Mr. Barro's rights. Accordingly, it is respectfully recommended that defendant's motion to suppress his post-Miranda statements should be granted.

14

**FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court. Any request for an extension of time to file objections must be made within the fourteen-day period. Failure to file a timely objection to this Report generally waives any further judicial review. Marcella v. Capital Dist. Physicians' Health Plan, Inc., 293 F.3d 42, 46 (2d Cir. 2002); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); see Thomas v. Arn, 474 U.S. 140 (1985).

SO ORDERED.

/S/
LOIS BLOOM
United States Magistrate Judge

Dated: March 22, 2013
      Brooklyn, New York