UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

UNITED STATES OF AMERICA,

             -against-

SHERMAN BARRO,

                  Defendant.

----------------------------------------------------------------X

**MEMORANDUM & ORDER**

**12-CR-160 (NGG) (LB)**

NICHOLAS G. GARAUFIS, United States District Judge.

      Defendant Sherman Barro has been indicted for the importation and possession of 500

grams or more of cocaine. (See Indict. (Dkt. 6).) He has moved to suppress statements he made

to federal agents on the day of his arrest. (See Barro Mot. to Suppress (Dkt. 19).) The court

referred the motion to Magistrate Judge Lois Bloom to conduct a suppression hearing and for a

Report and Recommendation ("R&R") pursuant to 28 U.S.C. § 636(b)(1)(A)-(B) and Federal

Rule of Criminal Procedure 59(b). (See Order Referring Mot. (Dkt. 26).) Judge Bloom held a

hearing and received post-hearing briefing, and issued an R&R recommending that Barro's

motion to suppress be granted. (See R&R (Dkt. 43).) The Government objected to the R&R.

(Gov. Obj. (Dkt. 46).) For the reasons explained below, the Government's objection to the R&R

is SUSTAINED and Barro's motion to suppress is DENIED.

**I.      BACKGROUND**

      **A.    Facts**

      Here at issue are statements Barro made to federal agents at John F. Kennedy ("JFK")

Airport on January 31, 2012. The record is comprised of: (1) the indictment filed by the

Government in this case; (2) Barro's declaration submitted in support of his motion to suppress;

and (3) the suppression hearing testimony of Special Agent Thomas Wilbert, the agent to whom

Barro made the statements. (See Indict.; Barro Decl. in Supp. of Mot. to Suppress (Ex. to Mot.) ("Barro Decl.") ¶¶ 2-3; Tr. of Feb. 13, 2013, Hr'g ("Hr'g Tr.") (Dkt. 42).)

On January 31, 2012, Barro flew into JFK Airport from Jamaica with his wife and infant child. (See Barro Decl. ¶¶ 2-3; Hr'g Tr. at 6:24-7:20.) After Barro retrieved his luggage from the baggage claim, he was stopped by customs officials who examined his bags. (Barro Decl. ¶ 4.) Barro was then separated from his wife and child and taken to an interview room, where he was told that his bags had tested positive for cocaine. (Id. ¶ 5.)

According to Barro's declaration, federal agents told Barro he should "tell [them] the truth and everything would be okay." (Id.) The agents spoke with Barro and went back and forth between his room and the room where his wife and child were being held. (Id. ¶ 7.) According to Barro, the agents told him that: (1) the cocaine found in his luggage could get him locked up for twenty-five years, and that if he cooperated the agents could tell the prosecutors to go easy on him; and (2) if he did not tell the federal agents what he knew, his wife could be arrested or locked up too. Barro says that the agents also asked him if he "wanted to see [his] child in a foster home" and verbally attacked him for "putting [his] child through this." (Id.) After this went on for twenty or thirty minutes, the agents took Barro upstairs and put him in another room. (Id.) At this point, the agents advised Barro of his Miranda rights. (Id. ¶ 8.) He agreed to waive his rights because, according to him, he "was afraid of what might happen to [his] wife and child." (Id.) The agents then questioned him and he made the statements that are at issue in this suppression motion. (Id.)

According to Agent Wilbert's testimony, the agent was called to the airport terminal around 12:20 pm on January 31. (Hr'g Tr. at 7:17-8:9.) He observed that Barro was in an interview room with several agents and that Barro's wife was in a separate room with another

agent. (Id. at 8-9.) Agent Wilbert first went to interview Barro's wife, "thinking maybe [Barro] might be more involved with what's happening than what she is and she might be more forthcoming with the answers if she's not involved than what he would be." (Id. at 10:1-9.) Agent Wilbert spoke with Barro's wife for approximately thirty to forty minutes, then went to speak to Barro. (Id. at 17:4-12.) After entering the interview room, but before advising Barro of his Miranda rights, Agent Wilbert made the following statements:

> I told him that he was under arrest for the importation of cocaine. I identified myself as a federal agent. I tell him that it's a serious offense, what's happening here. I tell him that it's important that he is honest with me and that he tells me the truth. I tell him that, you know, his cooperation is something that could help him out in the long run. I tell him that by telling me the truth, I will let the AUSA know and it could help him possible with a lower sentence. I also tell him that I can't guarantee him anything, I can't promise him anything. I can't determine his sentence, the AUSA can't determine his sentence, that is solely up to the judge, but from what I've seen in the past, people that have told the truth have received lesser sentences. I also tell him that it's up to him if he wants to talk. If he doesn't, that's fine also. We'll be here and we'll have another seizure in a few more hours after that, so it's up to him what he wants to do.

(Id. at 18-19.) After making these statements, Agent Wilbert asked Barro if he wanted to talk with the agents. (Id. at 17-19.) Barro said yes, and then Agent Wilbert advised Barro of his Miranda rights by reading from a card Agent Wilbert uses in all of his interrogations. (See id. at 10:21-12:15, 17-19; see also Miranda Card, Ex. A to Gov. Obj. (Dkt. 46-1) ("Miranda Card").) He read each line of the Miranda warning and confirmed that Barro understood each line. (Hr'g Tr. at 17:21-18:7.) Barro acknowledged that he understood each line by either saying yes or nodding his head. (Id.)

After being read his Miranda warnings, Barro agreed to waive his Miranda rights and made a series of statements. (Id. at 18.) Later that day, Barro was arrested for the importation of cocaine. (Id. at 6-7.)

3

When asked at the suppression hearing whether he had said anything to Barro relating to Barro's wife and child, Agent Wilbert answered that after reading Barro his <u>Miranda</u> rights, Agent Wilbert told Barro that he and his wife were both under arrest and that the agents were "going to have to call Child Protective Services for his child." (<u>Id.</u> at 21-23.) Agent Wilbert testified that he did not tell Barro that Barro's wife would be arrested or locked up if Barro did not speak to the agents, he did ask Barro whether he wanted to see his child in a foster home, and did not attack Barro verbally for "putting his child through this." (<u>Id.</u> at 23:7-15.)

**B.  Procedural History**

Barro was indicted on February 29, 2012, for importation of cocaine and possession of cocaine with intent to distribute, both offenses involving more than 500 grams of cocaine. (<u>See</u> Indict.) On December 4, 2012, Barro moved to suppress statements he made at JFK Airport on January 31, 2012. (Mot. to Suppress.) On January 16, 2013, the court referred Barro's motion to Magistrate Judge Bloom to conduct a suppression hearing and issue a recommendation on the motion. (Order Referring Mot.) Judge Bloom held a suppression hearing on February 13, 2013. (<u>See</u> Feb. 13, 2013, Minute Entry.) At the hearing the Government presented the testimony of Agent Wilbert. (<u>See</u> Hr'g Tr.) After the hearing, the parties submitted post-hearing briefs. (<u>See</u> Barro Post-Hr'g Mem. (Dkt. 35); Gov. Post-Hr'g Opp'n (Dkt. 37); Barro Post-Hr'g Reply (Dkt. 39).)

On March 22, 2013, Judge Bloom issued an R&R recommending that Barro's motion to suppress be granted. (<u>See</u> R&R.) On April 5, 2013, the Government filed an objection to Judge Bloom's R&R. (<u>See</u> Gov't Obj.) Barro responded in support of the R&R. (<u>See</u> Barro Resp. (Dkt. 48).) On June 13, 2013, the court held oral argument on the Government's objection.

## II.    STANDARD

### A.    Motion to Suppress for Violation of <u>Miranda v. Arizona</u>

In <u>Miranda v. Arizona</u>, the Supreme Court held that the Government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). This means that that "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." <u>Id.</u> "The purpose of the <u>Miranda</u> warning is to ensure that the person in custody has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary." <u>United States v. Capers</u>, 627 F.3d 470, 474 (2d Cir. 2010) (quoting <u>United States v. Carter</u>, 489 F. 3d 528, 534 (2d Cir. 2007)). "<u>Miranda</u> instructs generally that an uncounseled statement made by a defendant during custodial interrogation should be suppressed from use by the government in its case-in-chief unless the prosecution proves that the suspect voluntarily waived his right to counsel and privilege against self-incrimination." <u>United States v. Gaines</u>, 295 F.3d 293, 297 (2d Cir. 2002) (citing <u>Miranda</u>, 384 U.S. at 444).

### B.    Review of a Magistrate Judge's R&R

According to Federal Rule of Criminal Procedure 59(b), a district judge may refer a motion to suppress to a magistrate judge. <u>See</u> Fed. R. Crim. P. 59(b). The magistrate judge must then promptly conduct the required proceedings and enter on the record a recommendation for disposing of the motion, including any proposed findings of fact. <u>Id.</u> Within fourteen days or another period of time set by the court, "a party may serve and file specific written objections to

the proposed findings and recommendations," but "failure to object in accordance with [Rule 59] waives a party's right to review." Id. The district judge "must consider de novo any objection to the magistrate judge's recommendation," and may "accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions." Id.

## III.    DISCUSSION

Judge Bloom's R&R concluded that Barro was in custody when he was placed in the interview room, and that Agent Wilbert's unsolicited statements encouraging Barro to cooperate and tell the truth constituted interrogation. (See R&R at 5-6 (citing United States v. Plugh, 576 F.3d 135, 144 (2d Cir. 2009), rev'd on other grounds, 648 F.3d 118 (2d Cir. 2011)).) The R&R then applied Missouri v. Siebert, 542 U.S. 600 (2004), concluding that Agent Wilbur had employed "an intentional law enforcement strategy which vitiates the Miranda warnings' purpose," and that his interrogation constituted a deliberate circumvention of Miranda rendering the subsequent warning ineffective. (Id. at 6-10.) Thus, the R&R concluded, the Government failed to meet its burden to "establish by a preponderance of the evidence that despite Agent Wilber's spiel, the subsequent Miranda warnings given to Mr. Barro were effective." (Id. at 13.) "When the government gives a spiel, preamble, or whatever it may call it, before giving a defendant the required warnings, the government deliberately infringes on a defendant's fundamental rights," Judge Bloom wrote, and "[t]he government should not prosper from encroaching on Mr. Barro's rights." (Id. at 14.)

The Government objected to Judge Bloom's R&R, arguing primarily that Judge Bloom's application of Seibert was erroneous because there were no pre-Miranda statements.[1] (Gov Obj. at 1-3.) The Government argues that because Seibert does not apply, it need only to show that Barro's waiver was knowing and voluntary, and that it has met its burden to do so. (Id. at 2.)

For the reasons explained below, the court agrees with the Government that Seibert does not apply in these circumstances, and that the Government has met its burden to show that Barro's Miranda waiver was knowing and voluntary.

## A.    Application of Missouri v. Seibert

After concluding that Agent Wilbert's statements to Barro constituted custodial interrogation,[2] the R&R analyzed whether the agent's pre-Miranda interrogation rendered Barro's waiver involuntary and unintelligent. (R&R at 6.) Judge Bloom applied Supreme Court precedent addressing the validity of "midstream" Miranda warnings, correctly explaining that a mere failure to provide Miranda warnings prior to custodial interrogation does not render a postwarning statement inadmissible. (Id. (citing Elstad v. Oregon, 470 U.S. 298 (1985); United States v. Capers, 627 F.3d 470, 474-75 (2d Cir. 2010); United States v. Carter, 489 F.3d 528, 534 (2d Cir. 2007)).). Judge Bloom then analyzed whether Barro's statements were made after a midstream warning that had been made as a part of a two-step interrogation procedure designed

---

[1]    The Government also objected that Judge Bloom based her conclusion on factual premises that were unsupported by the record. (Gov. Obj. at 2.) However, because the court concludes that Seibert does not apply, the court need not address the Government's objection to Judge Bloom's characterization of the facts in her application of Seibert.

[2]    The Government concedes that Barro was in custody as soon as he entered the interview room. (R&R at 5 n.8 (citing Hr'g Tr. at 48).) The R&R correctly concluded that Barro was interrogated prior to being read his Miranda rights. (See id. at 5-6 (citing Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980) (concluding that interrogation includes express questioning as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect"); Plugh, 576 F.3d at 144 (agreeing that the district court was correct to conclude that the agent's statements that cooperation would be brought to the attention of the Assistant United States Attorney constituted interrogation); United States v. Montana, 958 F.2d 516, 518 (2d Cir. 1992) ("[The agent's] unsolicited statement informing the defendants that any cooperation would be brought to the attention of the United States Attorney constituted 'interrogation.'").

to circumvent Miranda, as prohibited by Missouri v. Seibert. (R&R at 6.) It is this part of her analysis to which the Government objects.

A mere failure to provide Miranda warnings prior to custodial interrogation does not render a postwarning statement inadmissible. Elstad, 470 U.S. at 314. However, there is an exception for cases "in which a deliberate, two-step strategy was used by law enforcement to obtain the postwarning confession." United States v. Moore, 670 F.3d 222, 228 (2d Cir. 2012) (citing Seibert, 542 U.S. at 622 (Kennedy, J., concurring); Carter, 489 F.3d at 536).

In Seibert, the police who interrogated a woman suspected of arson intentionally refrained from advising her of her Miranda rights, then questioned her and elicited information and a near-confession. 542 U.S. at 604-05. After the initial interrogation, the police gave her Miranda warnings and obtained a signed waiver of her Miranda rights. Id. at 605. The police then resumed questioning and confronted her with her pre-warning statements to elicit a full confession. Id. Five Justices of the Supreme Court concluded that the police tactic had violated the suspect's Fifth Amendment rights with regard to the statement given both pre- and post-warning, but the five Justices did not agree on the proper test for whether the post-warning statements should be suppressed. See id. at 611-12, 621. Four of the Justices in the majority agreed upon factors a court should analyze to determine whether the warning administered prior to the second statement was ineffective:

> (1) the completeness and detail of the questions and answers in the first round of interrogation,
> (2) the overlapping content of the two statements,
> (3) the timing and setting of the first and the second,
> (4) the continuity of police personnel, and
> (5) the degree to which the interrogator's questions treated the first round as continuous with the first.

8

See id. at 615. Justice Kennedy concurred in the outcome of the case, but concluded that the determinative fact was that the police had deliberately employed the two-step process "as a calculated way to undermine the Miranda warning." Id. at 622 (Kennedy, J., concurring). In his view, if a two-step process is used deliberately to undermine or circumvent Miranda, "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." Id.

### 1. Analysis under United States v. Moore

The Second Circuit has adopted several principles governing the application of Seibert in this Circuit, notably that Justice Kennedy's concurrence in Seibert "is controlling." Capers, 627 F.3d at 476. The Second Circuit has also held that a court applying Seibert should review the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness, and that the Government bears the burden of disproving by a preponderance of the evidence that the interrogator employed a deliberate two-step strategy to deprive the defendant of the protections afforded by the Fifth Amendment. Id. at 479-80.

These principles are be applied using a straightforward two-step analysis: "First, was the initial statement, though voluntary, obtained in violation of the defendant's Miranda rights? If not, there is no need to go further." United States v. Moore, 670 F.3d 222, 229 (2012). Second, if the initial statement was obtained in violation of the defendant's Miranda rights, the court must analyze whether "the government demonstrated by a preponderance of the evidence, and in light of the totality of the objective and subjective evidence, that it did *not* engage in a deliberate two-step process calculated to undermine the defendant's Miranda rights." Id.

Accordingly, the court first examines whether Barro made a pre-Miranda statement that was obtained in violation of his Miranda rights. The court concludes that he did not, which ends

the two-step analysis and renders Seibert inapplicable. Prior to being read his Miranda rights, Barro's only statement was to answer "yes" when Agent Wilbert asked whether Barro would be willing to talk to the agents. (See Hr'g Tr. at 18-19.) Barro's statement was neither inculpatory nor exculpatory, and indeed relayed *no content* relating to his alleged crimes. Merely agreeing to speak is not, without more, an inculpatory or self-incriminating statement falling under Miranda's protection. See McMillon v. Culley, 380 F. App'x 63, 66 n.2 (2d Cir. 2010); Nova v. Bartlett, 211 F.3d 705, 708 (2d Cir. 2000). Therefore, the court concludes that the appropriate answer in the first step of the Moore analysis is no, and thus this analysis need go no further. See Moore, 670 F.3d at 229.

### 2. The R&R's Application of Seibert

Rather than applying Moore, the R&R applied Seibert, noting that the Second Circuit reads Seibert "broadly to allow for suppression even where there is minimal overlap between the prewarning and postwarning statements." (R&R at 7. n.10.) In support of the R&R, Barro argues that Seibert must apply because otherwise "law enforcement authorities could deliberately delay Miranda warnings, interrogate a suspect and persuade him to speak, and then interpose the warnings after he has decided to speak but right before he makes a statement." (Barro Resp. at 14.) He argues that Miranda requires that "warnings precede the *interrogation*, not just the *statement*." (Id.) Thus, Judge Bloom and Barro read Seibert to extend to a situation where pre-Miranda interrogation fails to elicit any inculpatory statement.

The court declines to adopt this view. The R&R properly noted that the Second Circuit has read Seibert broadly to call for suppression even where there is minimal overlap between the pre-warning and post-warning statements. See Carter, 489 F.3d at 534. The R&R extended the Second Circuit's reading, however, to cover a situation where there is *no* overlap. (See R&R at

10

14 ("When the government gives a spiel, preamble, or whatever it may call it, before giving a defendant the required warnings, the government deliberately infringes on a defendant's fundamental rights.").) But Seibert involved a situation where police intentionally exhorted a suspect to make inculpatory statements, read the suspect her rights and obtained a waiver, and then used the suspect's previous statements as a tool to get the suspect to confess. Seibert, 542 U.S. at 605-606. Seibert did not contemplate a situation wherein pre-Miranda interrogation failed to elicit any substantive statement.[3]

The court is not aware of any federal court that has applied Seibert to circumstances where there were no substantive pre-Miranda statements. The R&R cites a district court opinion denying a petition for writ of habeas corpus and including an analysis under Seibert even though there were no pre-warning inculpatory statements. (See R&R at 7 n.10 (citing McMillon v. Culley, No. 07-CV-4806 (CPS), 2009 WL 2413632, at *8-9 (E.D.N.Y. Aug. 5, 2009).) However, the district court's opinion in McMillon can be distinguished in two important ways. First, although the Second Circuit affirmed the district court's overall holding, it clarified that "[t]his case is not like Seibert because [the petitioner] did not make an inculpatory statement before receiving Miranda warnings." McMillon, 380 F. App'x at 66. Second, in McMillon the petitioner made pre-Miranda statements denying having committed the crime, then told the detectives that he would tell them what happened. Id. But in the instant case, Barro made *no*

---

[3]    Moreover, the difficulty of applying the Seibert plurality's factors in cases lacking a substantive pre-warning statement indicates that the factors are simply not meant to be applied in such circumstances. Although the Second Circuit has adopted Justice Kennedy's concurrence as the controlling Seibert test, the Second Circuit has also clarified that a court should "review the totality of the objective and subjective evidence surrounding the interrogations, guided by—but not limited to—the factors identified by the plurality in Seibert." Moore, 670 F.3d at 230. These factors are "helpful indicia for whether an alleged two-step interrogation was intended to circumvent Miranda." Id. Two of the five factors—the completeness and detail of the questions and answers in the first interrogation, and the overlapping content between the pre and post-Miranda statements—assume the existence of a substantive pre-Miranda statement. See id. at 231. Another factor, the "degree to which the interrogator's questions treated the second round as continuous with the first," directs a court to look at whether "further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given." Seibert, 542 U.S. at 615. Thus, this factor also assumes pre-warning statements in most cases.

*statements at all* other than to answer "yes" that he would speak to agents. Therefore, the court concludes that Seibert does not apply where, as here, there is no substantive pre-warning statement. However, this conclusion does not end the court's inquiry.

**B.    Admissibility of Barro's Statements**

In circumstances involving pre-Miranda interrogation, if a case is not controlled by Seibert, it is controlled by Elstad v. Oregon, and "the dispositive inquiry is whether the statements [at issue] were provided voluntarily and free of coercion." Moore, 670 F.3d at 233 (citing Elstad, 470 U.S. at 318). Here, however, Barro's initial motion to suppress argued that his waiver was invalid because it was not knowing and voluntary. (See Barro Mot. to Suppress.) Whether post-waiver statements are made voluntarily and free of coercion can be a different analysis from whether a suspect made a knowing and voluntary waiver. Compare Moore, 670 F.3d at 233 (analyzing whether post-Miranda statements were voluntary, taking into account that the suspect had waived his Miranda rights), with United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995) (setting forth the standard for showing a valid waiver of Miranda rights, requiring that the Government prove that the waiver was knowing and voluntary). Both, however, involve considering the totality of the circumstances surrounding the interrogation. See Moore, 670 F.3d at 233; Jaswal, 47 F.3d at 542. Here, the totality of the circumstances surrounding the interrogation indicate that Barro's waiver was knowing and voluntary, and also that his subsequent statements were voluntary and free from coercion.

To prove that a defendant waived his Miranda rights, the Government must show two distinct components: that the relinquishment of rights was knowing, and that the waiver was voluntary. United States v. Plugh, 648 F.3d 118, 127-28 (2d Cir. 2011). "Knowing" means that "the waiver must have been made with a full awareness of both the nature of the right being

12

abandoned and the consequence of the decision to abandon it." Id. (citing Moran v. Burbine, 475

U.S. 412, 421 (1986)). "Voluntary" means "that it was the product of a free and deliberate

choice rather than intimidation, coercion, or deception." Id. (citing Moran, 475 U.S. at 421); see

also United States v. Amery, No. 02-CR-143 (GBD), 2002 WL 31027514, at *1 (S.D.N.Y. Sept.

10, 2002) (explaining that consent is involuntary where it is the result of coercive government

activity). The Government must prove waiver by a preponderance of the evidence. Capers, 627

F.3d at 480 (quoting Colorado v. Connelly, 479 U.S. 157, 168 (1986)).

A defendant's express waiver after being informed of his rights is "strong[ ] support" for

a finding that the waiver was knowing. See Plugh, 648 F.3d at 127. Agent Wilbert read Barro

his Miranda rights from a printed card. (See Hr'g. Tr. at 11-12, 17-18; Miranda card.) Agent

Wilbert asked Barro whether he understood his rights, and Barro acknowledged that he did.

(Hr'g Tr. at 17-18.) Barro then expressly waived his rights. (Id. at 18.) This undisputed record

indicates that Barro's waiver was knowing.

The record also shows that there was no coercive government action and thus Barro's

waiver was voluntary. In United States v. Pomares, the Second Circuit concluded that there was

no coercive government action where: (1) the defendant was advised of his rights; (2) he was not

subject to any threats, physical coercion, or protracted interrogation; (3) and no specific promises

were made to him, rather he was simply informed that it would be to his benefit to cooperate.

499 F.2d at 1222. Here, the circumstances are similar to those in Pomares. Barro was not

physically coerced or physically threatened, and he endured no more than an hour or two of

questioning. (See Barro Decl. ¶¶ 7-8; Hr'g Tr. at 23.)

Barro argues that Agent Wilbert's pre-Miranda statements to him rendered his waiver

involuntary because they interfered with his ability to make a free choice as to whether to waive

his rights. (Barro Reply at 5 (citing People v. Campbell, N.Y.S.2d 336 (2d Dep't 1981)).)

However, "the voluntariness of a waiver of [Miranda rights] has always depended on the absence

of police overreaching, not on 'free choice' in any broader sense of the word." Connelly, 479

U.S. at 170. Accordingly, "coercive police activity is a necessary predicate to the finding that a

[statement] is not 'voluntary.'" Id. at 167.

     Barro also argues that certain statements within Agent Wilbert's interrogation were so

coercive as to render his waiver involuntary. (See Barro Mot. to Suppress at 5.) However, the

totality of the record does not indicate the coercion necessary for this court to deem Barro's

waiver involuntary. Agent Wilbert did not make specific promises to Barro, but merely

informed him that the agent would pass along his cooperation to the AUSA and it could possibly

help him with a lower sentence. (Hr'g Tr. at 18.) Informing a defendant of the penalties he faces

is not coercive. Pomares, 499 F.2d at 1222. And while material misrepresentations based on

unfulfillable or other improper promises might overbear a defendant's will, promises of leniency

do not render statements involuntary. See United States v. Ruggles, 70 F.3d 262, 265 (2d Cir.

1995) ("[S]tatements to the effect that it would be to a suspect's benefit to cooperate are not

improperly coercive."); Jaswal, 47 F.3d at 542; Pomares, 499 F.2d at 1222 (citing cases); cf.

United States v. Ferrara, 377 F.2d 16, 17-18 (2d Cir. 1967) (concluding that it was not coercive

for an agent to tell defendant that if he cooperated he would likely get out on reduced bail).

Agent Wilbert's statement of the fact that he would have to call Child Protective Services for

Barro's child if both Barro and his wife were arrested is also not coercive. See United States v.

Garcia, No. 09-CR-330 (DLI), 2011 WL 6010296, at *5, 11 (E.D.N.Y. Nov. 30, 2011)

(explaining that it was not coercion where an agent told defendant that if he and his wife were

incarcerated, his children would have to be turned over to a responsible adult or a government

authority). Agent Wilbert's statement to Barro that Barro's wife had claimed not to have knowledge of any drugs but was likely going to be arrested along with Barro was not an express threat, and was not coercive. Cf. United States v. Crosby, No. 08-CR-186, 2010 WL 3304272, at *3-4 (W.D.N.Y. Aug. 5, 2010) (explaining the difference between express threats to a defendant's family in a menacing environment and statements about a defendant's family in circumstances where the defendant's will was not overborne).

Barro also argues that the fact that he was interrogated pre-Miranda and asked whether he wanted to answer questions before being given his Miranda warning rendered his waiver involuntary. (Barro Reply at 3 (arguing that "there is a crucial difference, for Miranda purposes, between things law enforcement officers say to a suspect before advising him of his rights and things they say afterwards.")) As discussed in the previous section, precedent forbidding the use of statements that were the product of a deliberate two-step interrogation does not apply in this case because there was no pre-Miranda inculpatory statement. The court notes its discomfort with Agent Wilbert's tactic of making lengthy statements about the benefits of cooperation before asking whether Barro wanted to speak with the authorities, and only *then* advising Barro of his Miranda rights. Nevertheless, while such an approach may not be good policy, in this case the use such a tactic did not constitute the type of coercion required to deem Barro's waiver involuntary.

The same circumstances that indicate that Barro's *waiver* was knowing and voluntary also support the conclusion that Barro's *statements* post-waiver were voluntary and free of coercion. The circumstances of Barro's post-Miranda interrogation "contain no traces of the 'brutality, [p]sychological duress, threats, [or] unduly prolonged interrogation' that courts have previously found when they have concluded that statements were involuntarily made." Moore,

15

670 F.3d at 233 (citing United States v. Verdugo, 617 F.3d 565, 575 (1st Cir. 2010)). Barro was fully informed of his rights and subsequently waived them. See Elstad, 470 U.S. at 318 ("The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative [in evaluating voluntariness]."); Moore, 670 F.3d at 233. Therefore, Barro's statements were voluntary and free from coercion.

****

In this case, Agent Wilbert interrogated Barro while he was in custody but before he was read his Miranda warnings. However, Barro did not make any statement before agreeing to speak to the agent, being read his Miranda rights, and waiving his rights, and so the court concludes that Seibert does not apply. Accordingly, the Government's objection to the R&R is sustained and the court declines to adopt the R&R's application of Seibert.

Because Seibert does not apply, the proper analysis is whether Barro's waiver was knowing and voluntary, and whether his statements were voluntary and free from coercion. After reviewing of the totality of the circumstances of the interrogation, the court finds that the record shows that both questions must be answered in the affirmative, and thus Barro's motion to suppress must be denied.

## IV. CONCLUSION

For the reasons explained above, the Government's objection to the R&R is SUSTAINED and Barro's motion to suppress is DENIED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
July 27, 2013

NICHOLAS G. GARAUFIS
United States District Judge